UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
—————————————————————

UNITED STATES OF AMERICA,

                    Plaintiff,

          v.

ROBERT L. SWINTON,

                 Defendant.

—————————————————————

DECISION & ORDER and
REPORT & RECOMMENDATION

15-CR-6055W

## PRELIMINARY STATEMENT

       By Order of Hon. Elizabeth A. Wolford, United States District Judge, dated April 21, 2015, all pretrial matters in the above-captioned case have been referred to this Court pursuant to 28 U.S.C. §§ 636(b)(1)(A)-(B).  (Docket # 54).

       Defendant Robert L. Swinton ("Swinton") is charged in a five-count indictment. (Docket # 53).  Count One charges him with conspiring from August through October 16, 2012 to manufacture and to possess with intent to distribute cocaine and cocaine base, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B) and 841(b)(1)(C).  (*Id.*).  Count Two charges Swinton with possessing cocaine with intent to distribute it, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C).  (*Id.*).  The third count charges him with using the downstairs apartment of 562 Maple Street, Rochester, New York for the purpose of manufacturing, distributing and using cocaine and cocaine base, in violation of 21 U.S.C. § 856(a)(1).  (*Id.*).  The fourth and fifth counts charge Swinton with possessing firearms in furtherance of the drug trafficking crimes

charged in the first three counts, in violation of 18 U.S.C. § 924(c)(1)(A)(i), and possessing

firearms as a convicted felon, in violation of 18 U.S.C. § 922(g)(1), respectively.  (*Id.*).

 Currently pending before the Court are Swinton's motions to suppress tangible

evidence, statements he made during and subsequent to the execution of a search warrant on

October 16, 2012, and recorded telephone calls he made from the Monroe County Jail.[1]  (Docket

## 59, 61, 63, 67, 70).  He also moves for an order requiring a *Franks* hearing, the disclosure of

grand jury minutes, and a bill of particulars.  (*Id.*).  On December 1, 2015, this Court held an

evidentiary hearing on Swinton's motion to suppress statements (Docket ## 71, 72), after which

the parties submitted post-hearing submissions (Docket ## 75, 76, 77).  For the reasons discussed

below, I deny Swinton's motions for a bill of particulars and disclosure of grand jury minutes.  I

further recommend that the district court deny Swinton's suppression motions.

## FACTUAL BACKGROUND

### I. Swinton's Statements

 This Court conducted an evidentiary hearing on December 1, 2015 concerning the

circumstances surrounding statements made by Swinton on October 16, 2012 during the

execution of a search warrant for 562 Maple Street and several hours later at the Rochester

Public Safety Building.[2]  (Docket # 71).  The government called two witnesses: Rochester Police

Sergeant Edward McDonald ("McDonald"), who testified about the statements inside 562 Maple

---

[1]  Swinton filed omnibus motions seeking other forms of relief including, *inter alia*, *Brady* material, discovery and inspection, Rule 404(b), 608 and 609 evidence, expert witness disclosure, and leave to file additional motions.  (Docket # 59).  Each of the above-referenced motions was decided by the undersigned or resolved by the parties in open court on November 6, 2015.  (Docket ## 68, 69).

[2]  The transcript of the hearing shall be referred to as "Tr. ___."  (Docket # 72).

Street, and Rochester Police Investigator Myron Moses ("Moses"), who testified about the statements at the Public Safety Building.  (Docket # 72).

A.    **Testimony of McDonald**

McDonald testified that he has been employed as a Sergeant with the Rochester Police Department for approximately eighteen years.  (Tr. 3-4).  On October 16, 2012, he was part of a team of law enforcement officers involved in the execution of a search warrant for an apartment located at 562 Maple Street, Rochester, New York.  (Tr. 4-5, 14, 18-19).  The team forcibly entered the apartment through a door that led into the kitchen; from there McDonald walked towards the living room and observed Swinton exiting a bedroom on the southeast side of the apartment.  (Tr. 4-5, 15).  McDonald grabbed Swinton's wrist, ordered him to the kitchen floor, and handcuffed him.  (Tr. 5, 15).  Two other adults and Swinton's infant child were also present in the apartment.  (Tr. 6).  While the search was being conducted, McDonald left Swinton in the custody of a uniformed police officer for a period of time while McDonald searched the basement, after which McDonald returned to the kitchen.  (Tr. 17-18).

McDonald testified that because all of the adults were going to be arrested, he needed to find another individual who could come to the apartment and take custody of Swinton's infant.  (Tr. 6-7).  According to McDonald, it was common police practice to try to find a custodian for a minor child under "circumstances such as th[ese]."  (Tr. 7).  McDonald advised Swinton that the adults were going to be taken to jail and he needed to identify a custodian for the child.  (Tr. 8, 21).  McDonald testified that Swinton responded, in sum and substance, "Get my phone.  It's in my room, the room I came out of."  (Tr. 8, 22, 27).

According to McDonald, he walked into the southeast bedroom and saw the phone on a chair.  (Tr. 8, 30).  McDonald brought the phone back to the kitchen, and Swinton

asked to use it.  (Tr. 9).  After reviewing his report of the search, McDonald clarified that he was

not certain if Swinton responded to McDonald's statement that he needed to identify a custodian

by asking to use his phone, or by telling McDonald to get his phone and then asking to use it.

(Tr. 28-29).  McDonald testified that he denied Swinton's request to use the phone out of

concerns for officer safety, and Swinton provided McDonald with the passcode to access the

phone.  (Tr. 9, 10).  McDonald testified that he could not recall whether he asked Swinton for the

passcode or whether Swinton volunteered it.  (Tr. 9).  Once the phone was unlocked, Swinton

identified two possible custodians.  (Tr. 10, 24).  McDonald contacted them and learned that they

were unavailable.  (Tr. 11, 24).  Swinton then identified the infant's mother, who was able to

come to the apartment and care for the child.  (Tr. 11, 14, 25).  McDonald explained that he

found the phone numbers for the three individuals he called in the "contacts" section of the

phone.  (Tr. 10-11, 24-25).  McDonald testified that he did not look at any other information in

the phone.  (Tr. 11).

Swinton was not read *Miranda* warnings at any time inside 562 Maple Street.

(Tr. 6).  McDonald testified that Swinton was not questioned about the location of his phone, nor

promised anything or threatened in order to disclose the location of his phone.  (Tr. 8, 12, 27).

According to McDonald, Swinton was not interviewed, made no other statements while he was

inside the apartment (other than possibly a statement that the infant was his child), and did not

appear to be under the influence of drugs or alcohol.  (Tr. 6, 13, 19-20).

B.   **Testimony of Moses**

Moses has been employed with the Rochester Police Department for the past

twenty-five years, the last five as an investigator.  (Tr. 33-34).  Moses testified that he was part

of the team that executed the warrant at 562 Maple Street on October 16, 2012.  (Tr. 34).

According to Moses, the warrant was executed at approximately 9:52 a.m.  (*Id.*).

      Moses testified that he had no conversations with Swinton at 562 Maple Street.

(*Id.*).  Swinton was eventually transported from Maple Street to the Rochester Police Department

Public Safety Building, where Moses and Malcolm Van Alstyne, an agent with the Bureau of

Alcohol, Tobacco and Firearms, interviewed him in an interview room at approximately 1:00

p.m.  (Tr. 34-35, 37).  Swinton had one arm handcuffed to the table during the interview.

(Tr. 36).  Both officers were seated.  (Tr. 38).

      Moses began the interview by identifying himself; Agent Van Alstyne did the

same, and Moses asked Swinton if he needed anything to drink.  (Tr. 37-38).  Swinton declined.

(Tr. 38).  Moses told Swinton that he would explain what was going on, but first needed to read

him his *Miranda* rights.  (Tr. 38, 52).  Moses confirmed that Swinton could read, write and

understand English and then, using a Rochester Police Department Notification and Waiver

Form, advised him of his rights by reading them directly from the form.[3]  (Tr. 41, 52-53).

Following that recitation, Moses asked him the two questions printed on the form and recorded

verbatim Swinton's responses.  (*Id.*).  Specifically, Moses asked, "Do you understand what I

---

[3]  The form that Moses testified he read verbatim to Swinton provided:

1. You have the right to remain silent – you do not have to say anything if you
   don't want to.

2. That anything you do say can be used against you in a court of law.

3. You have the right to talk to a lawyer before answering any questions and
   have him here with you.

4. If you can't pay for a lawyer, one will be given to you before questioning if
   you wish.

5. If you do wish to talk with one, you can stop me at any time.

(Tr. 39-41; Government Exhibit ("G. Ex.") 1).

have just said to you?"  (Tr. 42, 53; G. Ex. 1).  Swinton replied, "Yep."  (*Id.*).  Moses then asked, "With these rights in mind, do you agree to talk with me now?"  (*Id.*).  Swinton responded, "Yeah."  (*Id.*).  Moses never explicitly asked, "Are you waiving your rights now?"  (Tr. 53).

Following those questions, Moses and Van Alstyne interrogated Swinton for approximately fifteen minutes.  (Tr. 43).  Swinton never asked for an attorney or for the questioning to cease.  (*Id.*).  Moses characterized Swinton's demeanor as relaxed and responsive.  (Tr. 44).  According to Moses, Swinton did not appear to be ill, injured, intoxicated or confused.  (*Id.*).  Moses testified that neither he nor Van Alstyne promised Swinton anything or threatened him to induce his statements.  (Tr. 43-44).  Moses explained that the officers determined to conclude the interrogation because "we kept going back and forth about the partying at the house."  (Tr. 43).  Moses later returned to the interview room to obtain information from Swinton to complete the Prisoner Data Report, a process which took approximately six minutes.  (Tr. 45).  During that exchange, Moses did not return to the subject of Swinton's activities at 562 Maple Street.  (Tr. 55).

C.    **Swinton's Affidavits**

Swinton submitted two affidavits in support of his suppression motion.  (Docket ## 63, 67).  In the first, he states that officers tried to question him when he was taken into custody at 562 Maple Street.  (Docket # 63, ¶ 2).  He further states that he never agreed to speak to the officers or waived his rights, and that he demanded an attorney.  (*Id.* at ¶ 3).

In his second affidavit, Swinton affirms that two officers came into the kitchen when he was handcuffed – one holding his infant daughter and the other holding his cell phone that had been in his bedroom.  (Docket # 67, ¶ 3).  The officer with the cell phone asked Swinton if there was someone who could come and pick up his daughter.  (*Id.* at ¶ 4).  Swinton asked if he

could use his cell phone, and the officer refused, after which Swinton provided the officer with his passcode and directed him to the telephone numbers of certain relatives that were stored in the phone.  (*Id.* at ¶ 5).  The officer then made three calls on the phone.  (*Id.* at ¶ 6).

## II.    <u>The Search Warrant for 562 Maple Street</u>

On October 9, 2012, Monroe County Court Judge John L. DeMarco issued a warrant authorizing a search of the downstairs apartment at 562 Maple Street, Rochester, New York.  (Docket # 59-2 at 1-2).  The warrant authorized a search for:

> Cocaine in violation of section[] 220.00 of the New York State Penal Law.  Any evidence that tends to demonstrate that a drug related offense was committed or that a particular person participated in the commission of such offense, written records, books and computer records tending to show sale and trafficking of Cocaine and money showing profits from the sale of Cocaine, safe deposit box records and keys, records, ledgers, notes or other writings reflecting deposit, withdrawal, investment, custody or location of money, real property, personal property or other financial transactions, records, ledgers[,] notes or other writing reflecting ownership of said property, records reflecting the names, addresses and telephone numbers of persons from whom Cocaine is purchased and sold, including but not limited to, address and telephone books, including those contained in cellular telephones or Personal Data Assistants and telephone bills; all records[,] ledgers, notes or other writings reflecting income earned and reported to the Internal Revenue Service or other taxing agencies; residency and/or ownership of the described vehicle, including but not limited to, utility and telephone bills, cancelled envelopes, keys, deeds and mortgages; photographs and video tapes that depict individuals involved in Cocaine violations and/or photographs to assist in helping identify drug traffickers and their associates including undeveloped rolls of film, memory cards and disposable cameras.

(*Id.*).

The warrant was issued upon a supporting affidavit of Edmond Bernabei ("Bernabei"), an investigator with the Rochester Police Department, sworn to on October 9,

2012. (*Id.* at 3-9). Bernabei's affidavit described two controlled purchases allegedly made by a confidential informant, identified as CS-1, from the downstairs apartment at 562 Maple Street. (*Id.* at 7). According to the affidavit, Investigator Myron Moses and Bernabei met with CS-1 on September 28, 2012 to make plans to buy cocaine from the apartment. (*Id.*). Bernabei reported that at approximately 1:20 p.m., CS-1 was searched, no contraband was found, and CS-1 was provided with $20 in cash. (*Id.*). Approximately five minutes later, CS-1 was driven "to the area of 562 Maple Street and went directly to the location." (*Id.*). At about 1:25 p.m., "CS-1 left the location and walked directly" to the undercover vehicle and handed Moses a baggie containing "a white powdery substance." (*Id.*).

According to Bernabei's affidavit, CS-1 reported that "he/she walked down the driveway at 562 Maple Street and walked upon a back porch . . . on the rear of the house . . . [and] knocked at the only door that is on the rear porch." (*Id.*). A black male answered the door, and CS-1 asked to purchase one bag of cocaine. (*Id.*). The male handed CS-1 a baggie containing "a white powdery substance" in exchange for $20, and CS-1 walked directly to the undercover vehicle and handed Moses the "suspected cocaine." (*Id.*). The affidavit further stated that Moses field tested "the suspected crack cocaine substance in the bag and found it to test positive for the presence of cocaine." (*Id.*).

According to Bernabei's affidavit, on October 2, 2012, CS-1 met again with Moses and him to make plans to purchase cocaine from 562 Maple Street. (*Id.*). CS-1 was searched at approximately 11:54 a.m., and no contraband was found. (*Id.*). CS-1 was given $40 and, at approximately 12:03 p.m., was "dropped off in the area of 562 Maple Street and went directly to that location." (*Id.*). According to the affidavit, approximately four minutes later,

CS-1 left the location and walked directly to the undercover vehicle. (*Id.*). CS-1 handed Moses two baggies containing "a white powdery substance." (*Id.*).

Bernabei's affidavit stated that CS-1 reported entering the apartment in the same manner as on September 28th – by walking down the driveway on the east side of the house, walking up on the porch and knocking on the back door. (*Id.*). CS-1 reported that the same man with whom CS-1 had dealt on September 28th answered the door on October 2nd. (*Id.*). The man allowed CS-1 into the apartment through the back door leading into the kitchen. (*Id.*). CS-1 asked to purchase two bags of cocaine, and the man retrieved a bag from inside a kitchen cabinet. (*Id.*). The man removed two bags containing "a white powdery substance" from the larger bag and gave them to CS-1 in exchange for $40. (*Id.* at 8). CS-1 walked to the undercover vehicle directly from the location and handed Moses "the suspected cocaine." (*Id.*). The affidavit stated that Bernabei field tested "the suspected crack cocaine substance and found it to test positive for the presence of cocaine." (*Id.*).

Relevant to Swinton's motion, Bernabei's affidavit also contained the following two-sentence paragraph concerning the reliability of CS-1:

> Other officers of the Rochester Police Department and I know the Confidential Informant described in this affidavit. CS-1 has provided reliable information that has resulted in the arrest of suspects and the recovery of illegal narcotics and firearms.

(*Id.*).

## III.  Recorded Telephone Calls Made by Swinton from Monroe County Jail

In response to Swinton's motion to suppress evidence of recorded telephone calls he made while incarcerated in the Monroe County Jail, the government submitted an affidavit of

Charles W. Facteau, Systems Administration/Technician for Inmate Phone Services for the

Monroe County Jail for the past nineteen years. (Docket # 61-4, ¶ 1). His affidavit states:

> On each inmate phone at the Monroe County Jail, there is a placard detailing dialing instructions and giving notification that the telephone call may be monitored or recorded. Each placard is approximately six inches by three inches. The following notification is on the bottom of each placard in bold, black capital letters: "ALL CALLS ARE SUBJECT TO MONITORING AND RECORDING." This placard is placed on every phone accessible to inmates at the Monroe County Jail.
>
> Additionally, each time a phone call is placed from an inmate phone or the Monroe County Jail, there is a verbal warning that the inmate placing the telephone call will hear. This recorded notification states that the call may be recorded or monitored and both the inmate and the party being called are able to hear it.

(*Id*. at ¶¶ 2-3). At oral argument, Swinton's attorney stated that the defense had no basis to

challenge Facteau's factual assertions.


## DECISION & ORDER

### Motions for a Bill of Particulars and Disclosure of Grand Jury Minutes

Swinton's motions for a bill of particulars and disclosure of grand jury minutes

are both predicated on his assertion that the government's discovery contains no references

whatsoever to cocaine base. (Docket # 59 at 4-6, 35-41). In the absence of such evidence,

Swinton argues, the government should be required to particularize whether Swinton or one of

his co-conspirators manufactured, distributed, or possessed with intent to distribute cocaine base

and, if Swinton did so, the manner in which he did and the quantity that he personally

manufactured, distributed, or intended to distribute. (*Id.* at 40-41). Swinton also maintains that

the absence of such evidence in the government's discovery strongly suggests that the grand jury

had insufficient evidence upon which to charge Swinton with conspiring to manufacture and to possess with intent to distribute crack cocaine.  (*Id.* at 4-6).

The purpose of a bill of particulars is to enable the defendant "to identify with sufficient particularity the nature of the charge pending against him, thereby enabling [the] defendant to prepare for trial, to prevent surprise, and to interpose a plea of double jeopardy should he be prosecuted a second time for the same offense."  *United States v. Bortnovsky*, 820 F.2d 572, 574 (2d Cir. 1987) (citations omitted) (per curiam).  A bill of particulars is not to be used as a discovery device to obtain "evidentiary detail" about the government's case.  *See, e.g.*, *United States v. Torres*, 901 F.2d 205, 234 (2d Cir.) (citation omitted), *cert. denied*, 498 U.S. 906 (1990), *abrogated on other grounds by United States v. Marcus*, 628 F.3d 36 (2d Cir. 2010).  In other words, a bill of particulars should be granted where the information sought is "necessary" to prepare a defense and to avoid double jeopardy, not where it is merely "useful" to the defense in ascertaining the government's proof.  *See United States v. Henry*, 861 F. Supp. 1190, 1197 (S.D.N.Y. 1994); *see also United States v. Love*, 859 F. Supp. 725, 738 (S.D.N.Y.), *aff'd sub nom. United States v. Roberts*, 41 F.3d 1501 (2d Cir. 1994), *cert. denied*, 519 U.S. 951 (1996). Where the charge against the defendant is broad in scope, a bill of particulars may be more appropriate than where the charged conduct is more narrow.  *See, e.g.*, *United States v. Barnes*, 158 F.3d 662, 666 (2d Cir. 1998) ("a bill of particulars or other adequate disclosure is appropriate where a conspiracy count covers a complex series of events over a number of years, but provides only the bare bones of the charge"); *United States v. Davidoff*, 845 F.2d 1151, 1154-55 (2d Cir. 1988) (district court abused discretion in denying a bill of particulars identifying victims in seven-year racketeering conspiracy; court noted that principles governing

11

bills of particulars "must be applied with some care when the [g]overnment charges criminal offenses under statutes as broad as RICO").

   To warrant a bill of particulars, the indictment's charges against a defendant must be so general that they fail to advise him of the specific acts of which he is accused. *See United States v. Torres*, 901 F.2d at 234; *United States v. Henry*, 861 F. Supp. at 1198. In determining that question, the court may consider whether the information sought by the defendant has been made available in alternative forms, such as in discovery or prior court proceedings. *See United States v. Panza*, 750 F.2d 1141, 1148 (2d Cir. 1984); *United States v. Kelly*, 91 F. Supp. 2d 580, 583-84 (S.D.N.Y. 2000); *United States v. Ahmad*, 992 F. Supp. 682, 684 (S.D.N.Y. 1998); *United States v. Feola*, 651 F. Supp. 1068, 1133 (S.D.N.Y. 1987), *aff'd*, 875 F.2d 857 (2d Cir.), *cert. denied*, 493 U.S. 834 (1989).

   There is a presumption that grand jury proceedings are lawful and regular, *Torres*, 901 F.2d at 232 (quoting *Hamling v. United States*, 418 U.S. 87, 139 n.23 (1974)), and disclosure of grand jury proceedings is available only by order of the Court. Fed. R. Civ. P. 6(e). A party seeking disclosure bears the burden of establishing a "particularized need" or "compelling necessity" for such disclosure that outweighs the policy of grand jury secrecy. *Douglas Oil Co. of Cal. v. Petrol Stops Nw.*, 441 U.S. 211 (1979); *Pittsburgh Plate Glass Co. v. United States*, 360 U.S. 395, 400 (1959); *In re Rosahn*, 671 F.2d 690, 695 (2d Cir. 1982). Unspecified allegations of impropriety or mere speculation are not sufficient to satisfy this heavy burden. *United States Calandra*, 414 U.S. 338, 345 (1974). Therefore, "review of grand jury minutes is rarely permitted without specific factual allegations of government misconduct." *Torres*, 901 F.2d at 233.

Here, the government's response to Swinton's motions demonstrates that his factual premise is mistaken.  According to the government, among the evidence seized during the execution of the warrant at 562 Maple Street was a beaker in plain view in the kitchen sink. (Docket # 61 at 2).  The laboratory report, which the government included in its discovery disclosures, indicates that the residue in the beaker tested positive for cocaine base.  (*Id.* at Exhibit ("Ex.") A).  At oral argument, the government also proffered that it expects to offer testimony at trial from co-conspirators describing Swinton's involvement in the charged conspiracy to manufacture and to distribute crack cocaine.  The prosecutor noted that among the discovery turned over to the defense was a report of an interview with one of the individuals present with Swinton at the apartment when the warrant was executed, who described Swinton's involvement with drug activities during the two to three-month conspiracy.

Considering the government's representations, I find that Swinton has not met the burden for establishing that he is entitled to disclosure of the grand jury minutes.  Swinton's demand for disclosure rests on nothing more than a speculative assertion that irregularities may have occurred before the grand jury – an insufficient legal basis to justify disclosure of grand jury minutes.  *Douglas Oil Co. of Cal. v. Petrol Stops Nw.*, 441 U.S. at 218; *Pittsburgh Plate Glass Co. v. United States*, 360 U.S. at 400; *United States v. Leung*, 40 F.3d 577, 582 (2d Cir. 1994) ("[a] review of grand jury minutes should not be permitted without concrete allegations of [g]overnment misconduct"); *United States v. Shaw*, 2007 WL 4208365, *6 (S.D.N.Y. 2007). Nor has Swinton demonstrated that without further particularization of the specific activities he, as opposed to his co-conspirators, engaged in involving crack cocaine, he will be unable to adequately prepare for trial.  *See United States v. Cephas*, 937 F.2d 816, 823 (2d Cir. 1991) ("[a]lthough the government did not list the specific activities which showed how [defendant]

13

furthered the criminal enterprise or the conspiracy, such specific acts need not be alleged with respect to every named defendant, if the indictment is otherwise sufficient and names the other persons involved in the criminal activity"), *cert. denied*, 502 U.S. 1037 (1992); *United States v. Muhammad*, 903 F. Supp. 2d 132, 136 (E.D.N.Y. 2012) (denying request for particularization of narcotics conspiracy charge including additional specifics regarding "the role each such co-conspirator is alleged to have played" and "the precise conduct attributed to the defendant"); *United States v. Jimenez*, 824 F. Supp. 351, 363 (S.D.N.Y. 1993) (defendants in narcotics conspiracy prosecution were not entitled to "further specifics of the particular acts they are alleged to have participated in or for which they are being held responsible"). Accordingly, Swinton's motions for a bill of particulars and disclosure of grand jury minutes are denied.

## REPORT & RECOMMENDATION

### I.    Motion for a *Franks* Hearing

Swinton contends that he is entitled to a *Franks* hearing because of the inclusion of several allegedly false or misleading statements in Bernabei's affidavit submitted in support of the application for the search warrant for 562 Maple Street. (Docket # 59 at 13-25). He further maintains that these false and misleading statements were material to the issuing judge's probable cause determination and, when excised from the affidavit, render the warrant invalid, thus requiring suppression of the evidence seized pursuant to the warrant. (*Id.*).

Ordinarily, a reviewing court's obligation is merely to determine that the issuing judge had a "substantial basis for ... conclud[ing] that probable cause existed." *United States v. Smith*, 9 F.3d 1007, 1012 (2d Cir. 1993) (quoting *Illinois v. Gates*, 462 U.S. 213, 238-39 (1983)) (internal quotation omitted); *Walczyk v. Rio*, 496 F.3d 139, 157 (2d Cir. 2007) ("a reviewing

court must accord considerable deference to the probable cause determination of the issuing magistrate"). "Nevertheless, little or no deference is due where the government's affidavit misstated or omitted material information about probable cause." *United States v. Rajaratnam*, 2010 WL 4867402, *7 (S.D.N.Y. 2010) (citing *United States v. Canfield*, 212 F.3d 713, 717 (2d Cir. 2000)), *aff'd*, 719 F.3d 139 (2d Cir. 2013), *cert. denied*, 134 S. Ct. 2820 (2014).

Under *Franks v. Delaware*, 438 U.S. 154 (1978), "a district court may not admit evidence seized pursuant to a warrant if the warrant was based on materially false and misleading information." *United States v. Levasseur*, 816 F.2d 37, 43 (2d Cir. 1987) (citing *Franks v. Delaware*, 438 U.S. at 154). To justify a *Franks* hearing, a defendant challenging an affidavit must make "a substantial preliminary showing that (1) the affidavit contained false statements made knowingly or intentionally, or with reckless disregard for the truth; and (2) the challenged statements or omissions were necessary to the Magistrate's probable cause finding." *Id.* (citing *Franks*, 438 U.S. at 171-72) (internal quotation omitted). A hearing is required if the defendant provides the court with a sufficient basis upon which to doubt the truth of the affidavit at issue. As the Supreme Court has explained:

> To mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine. There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof. They should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons. Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained.

*Franks*, 438 U.S. at 171.

With respect to the first prong, "[a]llegations of negligence or innocent mistake are insufficient." *Id.* Instead, "[t]he focus is not on whether a mistake was made, but rather on

15

the intention behind the mistake." *United States v. Markey*, 131 F. Supp. 2d 316, 324 (D. Conn. 2001) (citing *Beard v. City of Northglenn*, 24 F.3d 110, 116 (10th Cir. 1994)), *aff'd*, 69 F. App'x 492 (2d Cir. 2003). Thus, *Franks* teaches that not all statements in an affidavit have to be true; instead "the statements [must] be 'believed or appropriately accepted by the affiant as true.'" *See United States v. Campino*, 890 F.2d 588, 592 (2d Cir. 1989) (quoting *Franks*, 438 U.S. at 165), *cert. denied*, 498 U.S. 866 (1990).

To determine whether a misstatement in an affidavit is material, the court must "set[ ] aside the falsehoods in the application, . . . and determine [w]hether the untainted portions [of the application] suffice to support a probable cause . . . finding." *United States v. Rajaratnam*, 719 F.3d 139, 146 (2d Cir. 2013) (internal quotations and citations omitted), *cert. denied*, 134 S. Ct. 2820 (2014). According to the Second Circuit, "[t]he ultimate inquiry is whether, after putting aside erroneous information and [correcting] material omissions, there remains a residue of independent and lawful information sufficient to support [a finding of] probable cause." *United States v. Rajaratnam*, 719 F.3d at 146 (quoting *United States v. Canfield*, 212 F.3d at 718).

In this case, Swinton identifies four allegedly false or misleading statements that he contends justify a *Franks* hearing. First, he argues that Bernabei "either negligently or intentionally misrepresented the type of substance field tested [following the two controlled purchases described in the warrant] as crack cocaine, although the officer alleged that what CS-1 described purchasing and provided for testing was a white powdery substance." (*Id.* at 18-19). Second, he maintains that Bernabei intended to mislead the issuing judge into believing that law enforcement officers actually observed CS-1 enter the apartment at 562 Maple Street, when in fact they did not. (*Id.* at 19-20). Third, he challenges the veracity of Bernabei's statement that

CS-1 was searched before the controlled purchases.  (*Id.* at 20-21).  Finally, Swinton contends that Bernabei's conclusory statement that CS-1 was reliable was misleading because it did not disclose specific information about the benefit CS-1 expected to receive in return for CS-1's cooperation, such as financial compensation or favorable treatment with respect to pending criminal charges.  (*Id.* at 21-22).

     With respect to the first challenged misrepresentation, I agree with the government that Swinton's assertion does not entitle him to a *Franks* hearing.  First, Swinton has not made a substantial preliminary showing of the falsity of Bernabei's statement that the substances that CS-1 turned over to Bernabei and Moses were "suspected crack cocaine."  *See United States v. Dixon*, 861 F. Supp. 2d 2, 11-12 (D. Mass. 2012) ("[the affiant's] identification of the substance as crack cocaine, based on his training and experience, was one of many factors that the magistrate could have considered in making a probable cause determination[;] [b]ecause [d]efendant has offered no evidence that [the affiant's] statements was either deliberately false or made with reckless disregard for the truth, a *Franks* hearing is not warranted on this ground"), *aff'd*, 787 F.3d 55 (1st Cir.), *cert. denied*, 136 S. Ct. 280 (2015).  In any event, the sentence that Swinton challenges discloses that the "suspected crack cocaine" in fact "test[ed] positive for the presence of cocaine."  In addition, the other references in the affidavit – to the negotiations between CS-1 and the seller, to the material in the baggie the seller handed to CS-1 and to the material in the baggie CS-1 handed to Investigator Moses – were all to cocaine or a white powdery substance.  It is difficult to understand the manner in which the issuing judge could have been misled by the one lone reference to the officers' suspicion that the cocaine was cocaine base.  Moreover, whether the controlled substance was cocaine base or cocaine, in my estimation, is ultimately immaterial as it does not detract from or alter the probable cause

determination.  In this case, the probable cause supporting the warrant was primarily based upon CS-1's alleged purchases of controlled substances from 562 Maple Street.  Whether the substance was cocaine or cocaine base is ultimately immaterial to the question whether there was probable cause to believe that controlled substances were present at the location.  *United States v. Green*, 572 F. App'x 438, 442 (6th Cir. 2014) (denying *Franks* hearing where affidavit alleged controlled purchases involving cocaine but field tests were positive for heroin; "even if we assume *arguendo* that [defendant] has made a substantial preliminary showing that several statements tangentially related to the controlled purchases were intentionally or recklessly falsified, his argument would still fail because even 'a single controlled purchase is sufficient to establish probable cause to believe that drugs are present at the purchase location'") (quoting *United States v. Archibald*, 685 F.3d 553, 558 (6th Cir. 2012), *cert. denied*, 133 S. Ct. 898 (2013)).

With respect to the second challenged statement, Swinton claims that Bernabei intended to mislead the issuing judge into believing that Bernabei and Moses had observed CS-1 enter the apartment at 562 Maple Street, when in fact they could not have because the apartment door is at the rear of the house and not observable from the street.  (Docket # 59 at 20).  I disagree that Bernabei's statements in the affidavit can be said to be misleading.  The affidavit clearly discloses that 562 Maple Street is a two-family residence and that the downstairs apartment is accessible through a door on the back porch of the house.  The affidavit states that CS-1 was "driven to the area of 562 Maple Street and went directly to that location."  The affidavit further includes a report of a detailed description provided by CS-1 to Bernabei and Moses indicating where CS-1 walked upon arrival at the house – down the driveway on the east side of the house, to the back porch, and through the only door on the back porch.  Taken

together, these statements disclose that the officers observed CS-1 walk to the house and subsequently learned from CS-1 where CS-1 went after arriving; the statements are neither false nor misleading.

Nor is a *Franks* hearing warranted by Swinton's other two challenges. As to the search of CS-1, Swinton simply speculates that CS-1 is female and could not have been searched prior to the controlled purchases because Bernabei and Moses are males. (Docket # 59 at 20). Even accepting the unproven assertion that CS-1 is female, nothing more than speculation supports the proposition that she could not have been searched before the purchases because it was Bernabei and Moses who drove her to the area of 562 Maple Street. Finally, neither a *Franks* hearing nor suppression of the evidence seized pursuant to the warrant is justified by Swinton's contention that Bernabei's statement about CS-1's reliability (he knows CS-1 and CS-1 has provided reliable information in the past leading to the recovery of illegal firearms and narcotics) is too conclusory to be credited without amplification of the benefits CS-1 received in return for CS-1's cooperation. *See United States v. Long*, 2015 WL 1458403, *4 (W.D.N.Y. 2015) ("the omissions regarding the informant's prior drug use and payment by law enforcement does not alter the probable cause analysis in this case, and *Franks* does not entitle the [d]efendant to any relief"). Accordingly, I recommend denial of Swinton's motion for a *Franks* hearing and suppression of tangible evidence.

## II.    Motion to Suppress Statements Made on October 16, 2012

### A.    Statements at 562 Maple Street

Swinton moves to suppress the statements he made to Sergeant McDonald in response to McDonald's statement that he needed to find someone to take custody of the infant

because all of the adults were being arrested.  (Docket # 75 at 3-5).  Swinton argues that his

statements were made while he was in custody, in response to the functional equivalent of

interrogation and without the benefit of *Miranda* warnings.  (*Id.*).  The government does not

dispute that Swinton was in custody and had not been advised of his *Miranda* rights, but

contends that McDonald's statement to Swinton was not "reasonably likely to elicit an

incriminating response from the suspect" and thus did not amount to interrogation.  (Docket # 70

at 6).  I agree.

   Interrogation is not limited to "express questioning"; rather, it extends to the

"functional equivalent" of questioning, namely, "'words or actions on the part of the police

(other than those normally attendant to arrest and custody) that the police should know are

reasonably likely to elicit an incriminating response from the suspect.'"  *United States v.

Broughton*, 600 F. App'x 780, 783 (2d Cir. 2015) (quoting *Rhode Island v. Innis*, 446 U.S. 291,

300-01 (1980)).  The Second Circuit has reaffirmed that the determination whether the police

should have known that their words or actions were reasonably likely to elicit an incriminating

response should be made upon "the totality of the circumstances."  *Id.* (quoting *Acosta v. Artuz*,

575 F.3d 177, 191 (2d Cir. 2009)).

   In this case, Sergeant McDonald advised Swinton that a custodian would need to

be identified to care for the infant while the adults were taken into custody.  Both parties agree,

and McDonald's testimony demonstrates, that the purpose of his statement was to obtain

information from Swinton, although the parties may disagree about the type or scope of

information being sought.  That McDonald's statement was not posed as a question does not

mean that it does not qualify as interrogation; it was plainly designed to elicit responsive

information.  The relevant issue is whether McDonald's inquiry falls within an exception to

*Miranda* and, if not, whether it was "reasonably likely [or not] to elicit an *incriminating* response from the suspect." *See United States v. Stroman*, 420 F. App'x 100, 102-03 (2d Cir. 2011) ("[t]he question thus posed by this case is whether the police conduct was intended to elicit an incriminating response from [defendant] before informing him of his *Miranda* rights").

Some authority exists to support the government's proposition that McDonald's statement falls outside the scope of *Miranda* because "it is the sort of question[] normally attendant to arrest and custody," which is "ordinarily innocent of any investigative purpose." (Docket # 76 at 6 (quoting *United States v. Gotchis*, 803 F.2d 74, 79 (2d Cir. 1986)). For example, the Ninth Circuit has held that "[q]uestions related to the care of minors are 'normally attendant to arrest and custody' and are not 'reasonably likely to elicit an incriminating response.'" *United States v. Galeote*, 357 F. App'x 110, 111 (9th Cir. 2009) (quoting *Rhode Island v. Innis*, 446 U.S. at 301), *cert. denied*, 559 U.S. 1080 (2010). Similarly, in *United States v. Meza-Beltran*, the court found that an officer's "mention [of child protective services] during the course of a home arrest in which a small child [wa]s present" was nothing other than a statement "normally attendant to arrest and custody." 2007 WL 2126501, *5 (D. Ariz. 2007). As the court acknowledged, "it remains the officers' duty to ensure the safety of a child during the course of a home arrest, which includes securing supervision by CPS if no appropriate adult will remain at a residence to care for a child." *Id.* Determining as a matter of law that a police officer's question or statement relating to the care and custody of a minor child during an arrest falls outside the reach of *Miranda* furthers that important public safety interest. That said, the Second Circuit does not appear to have held that such inquiries are insulated from *Miranda* as a matter of law.

In any event, I find that the outcome of Swinton's challenge is no different whether the standard is a legal one or a factual one based upon the totality of the circumstances. McDonald and the other law enforcement officers were present at 562 Maple Street to execute a search warrant. They encountered three adults and one infant child of one of the adults. After making the determination to arrest and take into custody all three adults, the officers had a responsibility to ensure the safe care and custody of the infant. In discharging that responsibility, McDonald told Swinton that he needed to find someone who could come to the apartment to care for the child. I do not find that McDonald's statement was reasonably likely to elicit an incriminating response. Rather, McDonald reasonably could have expected Swinton to respond by identifying names of individuals who could be contacted. *See*, *e.g.*, *United States v. Meza-Beltran*, 2007 WL 2126501 at *5 ("[o]fficers must take the necessary steps to secure appropriate supervision for a child during custody and arrest, and without more, a reference to CPS is not 'reasonably likely to elicit an incriminating response'"). That Swinton in fact responded with statements that appear to connect him to a particular phone and a particular bedroom at 562 Maple Street, and may indeed be incriminating in the context of the case against him, does not entitle him to an order suppressing their use at trial.

**B.    Statements at Public Safety Building**

Swinton also seeks suppression of the statements he made several hours later while in custody at the Public Safety Building. (Docket # 75 at 6-7). He contends that the government has not established that he validly waived his constitutional rights before speaking to Moses and Van Alstyne. (*Id.*). According to Swinton, Moses's failure to ask him explicitly "whether he intended to waive [his] rights or whether any choice to do so was voluntary"

22

precludes the government from demonstrating that he voluntarily waived his rights.  (*Id.*).  I
disagree.

To establish a valid waiver of *Miranda* rights, the government must prove by a
preponderance of the evidence "(1) that the relinquishment of the defendant's rights was
voluntary, and (2) that the defendant had a full awareness of the right being waived and of the
consequences of waiving that right."  *United States v. Jaswal*, 47 F.3d 539, 542 (2d Cir. 1995)
(citing *Moran v. Burbine*, 475 U.S. 412, 421 (1986)).  The law "does not impose a formalistic
waiver procedure that a suspect must follow to relinquish [his *Miranda* rights;] . . . the law can
presume that an individual who, with a full understanding of his or her rights, acts in a manner
inconsistent with their exercise has made a deliberate choice to relinquish the protection those
rights afford."  *Berghuis v. Thompkins*, 560 U.S. 370, 385 (2010).  Thus, the government need
not "obtain an express waiver of [*Miranda* rights] before proceeding with the interrogation."  *Id.*
at 387 (alteration in original) (quoting *North Carolina v. Butler*, 441 U.S. 369, 379 (1979)
(Brennan, J., dissenting)).  Instead, an implicit waiver may be inferred from the defendant's
conduct.  *See id.* at 384 (waiver may be implied through "the defendant's silence, coupled with
an understanding of his rights and a course of conduct indicating waiver") (quoting *North
Carolina v. Butler*, 441 U.S. at 373).

To demonstrate the adequacy of a waiver, the government must do more than
provide evidence that a *Miranda* warning was given and that the defendant thereafter made an
uncoerced statement.  *See id.*  The government "must make the additional showing that the
accused understood the[] rights."  *See id.*  Accordingly, "[w]here the prosecution shows that a
*Miranda* warning was given and that it was understood by the accused, an accused's uncoerced
statement establishes an implied waiver of the right to remain silent."  *Id.*

23

In examining whether a statement was made voluntarily, a court must consider the totality of the circumstances in which it was given "to determine whether the government agents' conduct 'was such as to overbear [a defendant's] will to resist and bring about [statements] not freely self-determined.'"  *United States v. Kaba*, 999 F.2d 47, 51 (2d Cir.) (quoting *United States v. Guarno*, 819 F.2d 28, 30 (2d Cir. 1987) (citations omitted)), *cert. denied*, 510 U.S. 1003 (1993).  In evaluating the totality of the circumstances, the court must assess: "(1) the characteristics of the accused, (2) the conditions of the interrogation, and (3) the conduct of law enforcement officials."  *United States v. Awan*, 384 F. App'x 9, 14 (2d Cir. 2010) (quoting *Green v. Scully*, 850 F.2d 894, 901-02 (2d Cir.), *cert. denied*, 488 U.S. 945 (1988)), *cert. denied*, 562 U.S. 1170 (2011).  Where circumstances suggest evidence of "brutality, [p]sychological duress, threats, [or] unduly prolonged interrogation," statements will be deemed involuntary.  *United States v. Moore*, 670 F.3d 222, 233 (2d Cir.) (alteration in original) (quoting *United States v. Verdugo*, 617 F.3d 565, 575 (1st Cir. 2010), *cert. denied*, 562 U.S. 1156 (2011)), *cert. denied*, 133 S. Ct. 48 (2012).

On the record before me, I find that Swinton, after being advised of his *Miranda* rights, voluntarily waived them and chose to speak to Moses and Van Alstyne.  After informing Swinton of his *Miranda* rights by reading them verbatim from a rights card, Moses asked Swinton whether he understood his rights, and Swinton replied that he did.  Moses then asked Swinton, "With these rights in mind, do you agree with me now?"  Again, Swinton responded affirmatively.

Moses's failure to ask explicitly whether Swinton was voluntarily waiving his rights was neither error nor requires suppression.  *See Berghuis v. Thompkins*, 560 U.S. at 384-85; *United States v. Scarpa*, 897 F.2d 63, 68 (2d Cir.), *cert. denied*, 498 U.S. 816 (1990).

24

Swinton was advised of his rights, stated that he understood his rights, and agreed to speak with Moses and Van Alstyne. Such facts establish that Swinton knowingly and voluntarily waived his rights.

Further, the credible testimony establishes that Swinton's statements were not coerced. As an initial matter, nothing in the record suggests that his age or characteristics rendered him particularly vulnerable to coercion, or that he was intoxicated, sick or in pain. In fact, Moses testified that Swinton seemed relaxed, cooperative and responsive. Moses testified that no promises or threats were made to induce Swinton to speak. Finally, the conditions under which the statements were made do not suggest that Swinton was subjected to any undue influence to induce a statement.

Accordingly, I recommend that the district court deny Swinton's motion to suppress the statements he made on October 16, 2012.[4]

## III.    Motion to Suppress Evidence of Recorded Calls from the Monroe County Jail

Swinton moves to suppress evidence of telephone calls he made as an inmate at the Monroe County Jail, which were recorded by the jail. (Docket # 59 at 26-34). He argues that the recording of his calls violated Title III because it was done without his consent, either express or implied, and for no legitimate penological purpose. (Docket # 59 at 25-34).

This Court addressed and rejected this very argument in a Report and Recommendation issued in another case merely three weeks ago, *United States v. Simmons*, 2016

---

[4] Following the submission by his counsel of a post-hearing submission, Swinton submitted a *pro se* submission. *See* Docket # 77. Because he is represented by counsel, however, he does not have the right to make additional arguments *pro se*. *See, e.g., United States v. Pray*, 2014 WL 3534010, *11 (W.D.N.Y.), *report and recommendation adopted by*, 2014 WL 4370483 (W.D.N.Y. 2014). In any event, none of his contentions alter my findings or recommendations. Many of his arguments rest on challenges to the credibility of McDonald's and Moses's testimony, which certainly may be raised on cross-examination at trial or through Swinton's testimony, should he choose to testify. At this juncture, and based on the record before me, I find McDonald's and Moses's testimony credible.

WL 285176, *24-25 (W.D.N.Y. 2016).  In that case, the defendant had been detained in several different jails, one of which was the Monroe County Jail.  *Id.*  Through the same attorney who represents Swinton in this case, he sought suppression of recorded calls from the Monroe County Jail on the grounds that the recording violated Title III, as well as the First, Fourth and Fifth Amendments.  *Id.*  For the same reasons articulated in *Simmons*, Swinton's Title III challenge should be denied in this case.

**IV.    Motion to Suppress Evidence Obtained Through Search and Seizure of Swinton's Cellular Telephone**

Finally, Swinton seeks suppression of evidence seized from his cell phone on the grounds that the search warrant did not authorize the search and seizure of the contents of the phone.  (Docket # 59 at 25-26).  There is no dispute that a search of the phone was conducted by police officers using a software tool, which yielded evidence of photographs, videos, call logs and text messages.  (Docket # 70 at 3-4).  The government opposes the motion on three independent bases: first, that the search and extraction of evidence was authorized by the terms of the warrant; second, that the seizure of the challenged evidence was lawful under the plain view exception to the warrant requirement; and third, that the search was conducted in good faith reliance on the warrant under *United States v. Leon*, 468 U.S. 897 (1984).  (Docket # 70).

The parties' dispute over the scope of the terms of the search warrant is unsurprising considering the unwieldly and somewhat confounding grammar of the seventeen-line sentence at issue.[5]  That one sentence contains twenty-five commas and three semicolons, making it difficult to determine where one clause or phrase begins and another ends.

---

[5]  Although the Rochester Police Department appears to use this language as a matter of practice in its search warrant applications, the text has since been modified – both in its language and grammar – to avoid some of the confusing issues noted in this decision.  *See, e.g.*, *United States v. Pray*, 2014 WL 3534010 at *1.

>Any evidence that tends to demonstrate that a drug related offense was committed or that a particular person participated in the commission of such offense, written records, books and computer records tending to show sale and trafficking of Cocaine and money showing profits from the sale of Cocaine, safe deposit box records and keys, records, ledgers, notes or other writings reflecting deposit, withdrawal, investment, custody or location of money, real property, personal property or other financial transactions, records, ledgers[,] notes or other writing reflecting ownership of said property, records reflecting the names, addresses and telephone numbers of persons from whom Cocaine is purchased and sold, including but not limited to, address and telephone books, including those contained in cellular telephones or Personal Data Assistants and telephone bills; all records[,] ledgers, notes or other writings reflecting income earned and reported to the Internal Revenue Service or other taxing agencies; residency and/or ownership of the described vehicle, including but not limited to, utility and telephone bills, cancelled envelopes, keys, deeds and mortgages; photographs and video tapes that depict individuals involved in Cocaine violations and/or photographs to assist in helping identify drug traffickers and their associates including undeveloped rolls of film, memory cards and disposable cameras.

For example, the sentence uses commas to separate numerous apparently independent clauses or phrases identifying particular evidence to be searched, and then suddenly and curiously adopts the use of semicolons to separate the remaining three. This grammatical juxtaposition commonly suggests that the material preceding the semicolon is intended to be read together as a cohesive unit, but the substance of the content preceding the semicolon suggests otherwise.[6] In other words, the language of the warrant supports the interpretation that the material preceding the

---

[6] The sentence is confusing even as to the material following the semicolons. For example, the sentence includes the following material set apart by semicolons:

>residency and/or ownership of the described vehicle, including but not limited to, utility and telephone bills, cancelled envelopes, keys, deeds and mortgages.

Obviously, agents cannot search for "residency and/or ownership." Is there a clause or phrase which the quoted material is intended to modify? The substance of the material would suggest so, even though the grammar suggests not.

semicolon consists of independent categories of evidence, although it is still unclear where one category begins and another ends.[7]

        In any event, relevant to Swinton's challenges, one of the warrant's clauses explicitly authorizes a search of cellular telephones for:

> records reflecting the names, addresses and telephone numbers of persons from whom [c]ocaine is purchased and sold, including but not limited to, address and telephone books, including those contained in cellular telephones or Personal Data Assistants and telephone bills.

This language defeats any argument by Swinton that the warrant did not authorize the seizure of the phone.

        This plain language also clearly authorizes the search of the phone's address book or "contacts" information.  According to the government, among the information obtained from the phone that it intends to use at trial are those "portions of the phone book/contact list that reflect the names and contact information for individuals from whom cocaine [was] purchased and sold."  (Docket # 70 at 4).  That evidence was lawfully seized by the terms of the warrant.

        Whether the terms of the warrant authorized the search for and seizure of the two other categories of information the government seeks to introduce is a much closer question. The government has identified those categories as:

> Certain SMS (text) messages tending to show the sale and trafficking of cocaine, as well as the telephone numbers/contact information associated with those SMS messages; and . . . records indicative of the owner or user of the device.[8]

---

[7]  For example, it is unclear whether the following provision authorizes a search for records of currency or currency itself:

> written records, books and computer records tending to show sale and trafficking of [c]ocaine and money showing profits from the sale of [c]ocaine.

[8]  It is clear that the government searched for and seized photographs and videotapes from the cell phone. Although the government has not stated that it intends to use any of the photographs and videotapes at trial, the search for and seizure of such evidence was permitted by the warrant's last clause authorizing a search for:

(*Id.*).  The warrant language explicitly referencing cellular telephones contains no language expressly authorizing a search of text messages or information identifying the owner or use of the device.  Among other arguments, the government contends that these searches were authorized by the language authorizing a search for "written records, books and computer records tending to show sale and trafficking of [c]ocaine."  (*Id.* at 6).  The government has cited no controlling authority, and this Court is unaware of any, holding that a warrant authorizing a search for computer records necessarily includes cellular telephone records.  Indeed, it is possible that text messages – a communication method most commonly utilized through cell phones and not computers, at least in 2012 – exist only in cell phone records and not in computer records.

The government urges that the search should be upheld on the alternate grounds that the text messages were or would have been discovered in plain view during the course of a lawful search for names and contact information of individuals involved in the sale and purchase of cocaine.  (*Id.* at 8-10).  As noted above, the search was evidently conducted with the use of a software program.  (*Id.* at 3).  In order to ascertain the facts necessary to evaluate the government's argument that the plain view exception applies, this Court shall conduct an evidentiary hearing on that issue.  A status conference shall be held on **February 29, 2016**, at **4:00 p.m.**, to address the scope of and to set a date for the hearing.

---

photographs and video tapes that depict individuals involved in [c]ocaine violations and/or photographs to assist in helping identify drug traffickers and their associates including undeveloped rolls of film, memory cards and disposable cameras.

*See United States v. Miller*, 2013 WL 6145765, *4 (W.D.N.Y. 2013) (warrant's authorization to search for and seize "photographs" "reasonably encompasses all photographs whether printed and finished or stored in digital format").

## <u>CONCLUSION</u>

For the reasons stated above, Swinton's motion for a bill of particulars and

disclosure of grand jury minutes **(Docket # 59)** are **DENIED**.  Further, for the reasons stated

above, I recommend that the district court deny Swinton's motion for a *Franks* hearing and for

suppression of statements he made during and subsequent to the execution of a search warrant on

October 16, 2012, and recorded telephone calls he made from the Monroe County Jail.  (**Docket**

**# 59**).  Pending an evidentiary hearing, Swinton's motion to suppress certain evidence seized

from his cellular telephone is **RESERVED**.  **(Docket # 59).**

**IT IS SO ORDERED.**



*s/Marian W. Payson*
_____
MARIAN W. PAYSON
United States Magistrate Judge


Dated: Rochester, New York
February 10, 2016

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

**ORDERED**, that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of this Court within fourteen (14) days after receipt of a copy of this Report and Recommendation in accordance with the above statute and Rule 59(b) of the Local Rules of Criminal Procedure for the Western District of New York.[9]

The district court will ordinarily refuse to consider on *de novo* review arguments, case law and/or evidentiary material which could have been, but was not, presented to the magistrate judge in the first instance. *See*, *e.g.*, *Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co.*, 840 F.2d 985 (1st Cir. 1988).

**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.** *Thomas v. Arn*, 474 U.S. 140 (1985); *Small v. Sec'y of Health & Human Servs.*, 892 F.2d 15 (2d Cir. 1989); *Wesolek v. Canadair Ltd.*, 838 F.2d 55 (2d Cir. 1988).

The parties are reminded that, pursuant to Rule 59(b) of the Local Rules of Criminal Procedure for the Western District of New York, "[w]ritten objections . . . shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." **Failure to comply with the provisions of Rule 59(b) may result in the District Court's refusal to consider the objection.**

Let the Clerk send a copy of this Order and a copy of the Report and Recommendation to the attorneys for the parties.

**IT IS SO ORDERED.**

*s/Marian W. Payson*
MARIAN W. PAYSON
United States Magistrate Judge

Dated: Rochester, New York
       February 10, 2016

---

[9] Counsel is advised that a new period of excludable time pursuant to 18 U.S.C. § 3161(h)(1)(D) commences with the filing of this Report and Recommendation. Such period of excludable delay lasts only until objections to this Report and Recommendation are filed or until the fourteen days allowed for filing objections has elapsed. *United States v. Andress*, 943 F.2d 622 (6th Cir. 1991); *United States v. Long*, 900 F.2d 1270 (8th Cir. 1990).