UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA,

                        Plaintiff,

      v.

ROBERT L. SWINTON,
a/k/a Robert L. Swinton, Jr.,
a/k/a Scooby,

                        Defendant.
_____

REPORT & RECOMMENDATION

15-CR-6055W

## PRELIMINARY STATEMENT

Currently pending before the Court for report and recommendation is Swinton's motion to suppress evidence seized from his cellular telephone, the one motion left open in my prior opinion dated February 10, 2016. (Docket ## 59, 78). In that report and recommendation, the Court concluded that a further evidentiary hearing was necessary to evaluate the applicability of the plain view exception to the warrant requirement. (*Id.* at 26-29). Familiarity with that opinion, including the relevant factual and procedural background, is assumed.

A hearing was conducted on April 4, 2016, at which time the government withdrew its reliance on the plain view doctrine.[1] (Tr. 61-62, 93-94; Docket # 91 at 4 n.2). The parties agreed, however, that the hearing should proceed in order to develop the record adequately to evaluate the government's argument that the search for and seizure of text messages from Swinton's cellular telephone may be upheld under *United States v. Leon*, 468 U.S. 897 (1984). (Tr. 62, 75-76, 93-94). Subsequent to the hearing, the parties submitted post-hearing memoranda of law, which this Court has considered. (*See* Docket ## 90, 91).

_____
[1] The transcript of the hearing shall be referred to as "Tr. __." (Docket # 84).

## APRIL 4, 2016, EVIDENTIARY HEARING

At the hearing, the government called Joseph Morabito, a commander employed by the Rochester Police Department ("RPD"). (Tr. 63). The defense called no witnesses.

Commander Morabito ("Morabito") offered the following testimony relevant to the *Leon* issue. In 2012, Morabito worked as the Lieutenant in charge of the Greater Rochester Narcotics Enforcement Team ("GRANET"). (*Id.*). In that capacity, he became familiar with and employed a device manufactured by Cellebrite, which was designed to forensically extract information from cellular telephones. (Tr. 63-64). He testified that he used the Cellebrite device to extract data from Swinton's cellular phone during the investigation leading to Swinton's prosecution and estimated that he had used the device on approximately forty other occasions. (Tr. 64, 70).

Based on his experience, Morabito testified as to how the device worked. He explained that after connecting the phone to be searched to the Cellebrite device, the device would display various prompts. (Tr. 66-67). After confirming the make and model of the phone to be searched, the prompt would ask whether the user wanted to extract data from the phone. (Tr. 68). The user would indicate "yes" by pushing the "ok" button on the device. (*Id.*). At that point, the device would allow the user to select particular categories of data to be searched, including "contact list, text messages, photos, call data, both incoming and outgoing calls, ring tones, [and] videos." (*Id.*). Once the user pressed the "ok" button in response to the prompt "Do you want to start?," the device would copy the requested categories of data directly onto an attached thumb drive. (Tr. 68-69). The device prevented the user from editing or changing any of the downloaded and copied data. (Tr. 69).

With respect to the search of Swinton's phone, Morabito testified that Bernabei provided him with the phone and a copy of the search warrant for 562 Maple Street the same day that the warrant was executed. (Tr. 70, 86-87). According to Morabito, he performed the data extraction the next day. (Tr. 87). Before beginning, he reviewed the warrant "to ensure what parameters I was allowed to search for from the phone, what was contained on the warrant so I could know what I could select as far as what I could search for." (Tr. 70). Morabito testified that based on his review of the warrant, he selected the following categories of data to be searched and copied:

> [c]ontacts, SMS text messages, calendar notes and tasks, call logs, MMS multi-media messages, images, and video.

(Tr. 71-74; Government's Exhibit ("G. Ex.") 3). He did not select the categories "ring tones" or "audio." (Tr. 74). After the copying was completed, Morabito gave the thumb drive and the cellular phone to Bernabei. (Tr. 79). As Morabito further explained, the thumb drive contained a file in the form of a report that gathered the data extracted and sorted and reproduced it by category. (Tr. 72). The report from the extraction performed on Swinton's phone was admitted into evidence and has been reviewed by this Court. (Tr. 79-80; G. Ex. 3).

Morabito testified that he believed that the following language in the warrant authorized the search for text messages:

> records reflecting the names, addresses and telephone numbers of persons from whom [c]ocaine is purchased and sold, including but not limited to, address and telephone books, including those contained in cellular telephones.

(Tr. 78; G. Ex. 1). His testimony also made clear that the language of the warrant was identical to language commonly used in warrants at that time, although it has since been modified, and

3

that data extractions he performed in cases involving such warrants typically included searches for text messages. (Tr. 65, 91-93).

Morabito observed, based on his more than ten years' experience investigating narcotics activities, that many drug transactions are conducted through text messages, which, "if you read them, [allow] you [to] actually get phone numbers . . . that take you to cocaine distributors and/or customers from the text messages." (Tr. 77-78). As he explained, a phone number is associated with every text message; often the phone number may also be linked to an identified individual in the phone's "contacts" or address book. (Tr. 90). In this case, the section of the report of the data copied from Swinton's cell phone that is captioned "SMS – Text Messages" reflects phone numbers associated with every text message and names (often a nickname) associated with the substantial majority of them. (G. Ex. 3). At the end of that section, the report states, "Phonebook name lookup [was] used to retrieve names." (*Id.*). The section of the report captioned "MMS – Multimedia Messages" includes text messages that are accompanied by photographs. (*Id.*).

On cross-examination, Morabito admitted that there was nothing in the warrant that suggested that Swinton's cell phone had been used to conduct narcotics transactions. (Tr. 85-86).

## DISCUSSION

None of the testimony adduced at the hearing diminishes my skepticism as to the merits of the government's argument that the plain language of the warrant authorized the search of Swinton's phone for text messages. (*See* Docket # 78 at 28-29). First, as a matter of law, it is far from clear that Morabito's testimony as to his interpretation of the warrant's language is even

4

relevant to the Court's determination of the plain language of the warrant.  Even if it were, his reliance rests on the following clause in the warrant, the plain language of which I find suggests the contrary:

> records reflecting the names, addresses and telephone numbers of persons from whom [c]ocaine is purchased and sold, including but not limited to, address and telephone books, including those contained in cellular telephones.

(Tr. 77-78).  The plain language refers to cellular telephones in the context of "address and telephone books" and, in my estimation, limits the search of cellular telephones to searches for address and telephone listings, such as those commonly found in the "contacts" section of the phone.

The government's reliance on the *Leon* good faith exception raises a question different from the plain language question.  *Leon* focuses on what a reasonable officer could believe he was authorized to search for under the terms of a warrant.  In this case, I credit Morabito's testimony that he believed in good faith he was authorized by the warrant's language quoted above to search for and copy text messages.  The question is whether his belief, regardless of the Court's disagreement with its merits, is objectively reasonable.

Turning to that question, I note first that this case concerns the applicability of *Leon* in the context of an officer's reliance on warrant language to justify the scope of his search – a search that may in fact have exceeded the scope of the plain language of the warrant.  As this Court previously recognized in *United States v. Miller*, 2013 WL 4505458, *4 (W.D.N.Y.), *report and recommendation adopted*, 2013 WL 6145765 (W.D.N.Y. 2013):

> "Although an officer will usually behave unreasonably by exceeding the scope of a search warrant, the Supreme Court has held that in some cases the good faith exception may nevertheless apply."  *United States v. Jefferson*, 2010 WL 1186279, *5 (E.D. Wis. 2010) (citing *Massachusetts v. Sheppard*, 468 U.S. 981,

> 988 (1984) and *Maryland v. Garrison*, 480 U.S. 79, 87 (1987)); *see also United States v. Biles*, 100 F. App'x 484, 493-94 (6th Cir. 2004) ("*Leon* exception may save a search that exceeds the scope of a warrant if officers reasonably mistake what may be found within a home's curtilage"); *United States v. Gorman*, 104 F.3d 272, 274-75 (9th Cir. 1996) (when determining whether officers exceeded the scope of warrant, "we use an objective test: would a reasonable officer have interpreted the warrant to permit the search at issue") (citing *United States v. Leon*, 468 U.S. at 918-19); *United States v. Rodriguez*, 2007 WL 466752, *58 (D.N.D. 2007) (officers were objectively reasonable in interpreting warrant that authorized search for "clothing that contained blood, hair or fibers" to authorize seizure of blood, hair or fibers on upholstery or floor of vehicle; "[i]f the officers exceeded the scope of the warrant, they acted in good faith [and . . .] the exclusionary rule does not apply"), *aff'd*, 581 F.3d 775 (8th Cir. 2009); *cert. denied*, 562 U.S. 981 (2010). Under such circumstances, "[i]f it was objectively reasonable for the officer to believe that the warrant authorized him to search a particular area, even though it is later determined that the search exceeded the strict textual scope of the warrant, the evidence need not be suppressed." *See United States v. Jefferson*, 2010 WL 1186279 at *5 (collecting cases).

Morabito credibly testified that he believed the warrant's language authorizing a search for records reflecting names, addresses, and phone numbers of individuals engaged in cocaine transactions, including but not limited to address and telephone books contained in cellular phones, permitted officers to search Swinton's cell phone for text messages. (Tr. 71-72, 77-78, 90-91). He explained his reasoning: based upon his substantial experience investigating drug trafficking, he knows that drug transaction arrangements are "common[ly] . . . made over text messages"; that all text messages are linked to a phone number; and, that those phone numbers are often linked to a particular individual identified in the user's cellular phone's "contacts." (*Id.*).

The scant relevant caselaw that this Court has found supports the government's position. For example, less than one year before the search of Swinton's phone, the Fifth Circuit upheld a search of a cellular phone for text messages and call logs conducted in reliance on a

6

search warrant that did not identify cell phones as items to be searched or seized. *See United States v. Aguirre*, 664 F.3d 606, 613-15 (5th Cir. 2011), *cert. denied*, 132 S. Ct. 1949 (2012). In that case, the court noted that the warrant authorized the search of "a wide variety of items used to facilitate drug sales and trafficking," which were listed on an attachment to the warrant. The court reasoned:

> [T]he cellular text messages, directory and call logs of [defendant's] cell phone searched by law enforcement officers can fairly be characterized as the functional equivalents of several items listed in Attachment A, including correspondence, address books and telephone directories. Furthermore, [the agent] testified during the suppression hearing that "[c]ell phones are highly significant in that they record the transaction of – in some cases the buying and selling of drugs." As such the cell phone in this case, used as a mode of both spoken and written communication and containing text message and call logs, served as the equivalent of records and documentation of sales or other drug activity.

*Id.* at 614-15. In the absence of contrary authority from the Second Circuit, *Aguirre* lends strong support for the government's position that a reasonable officer in Morabito's position could have interpreted the warrant in this case to authorize a search of Swinton's cellular phone for text messages – information from which the identities of individuals engaged in cocaine transactions could be determined, whether directly from the messages or indirectly by cross-referencing the phone number associated with the message to Swinton's "contacts." *See also United States v. Tatro*, 2016 WL 3059542, *5 (M.D. Fla. 2016) (applying *Leon* to search of cellular phone under warrant authorizing searches of "pocket computer" and "computer storage media"; "[t]here is no evidence here that the [a]gents acted with intentional deceit or in bad faith or that they deliberately exceeded the scope of the [s]earch [w]arrant[;] [t]he [a]gents testified unequivocally that they believed the [c]ell [p]hones and SD [c]ard to be covered by the [s]earch [w]arrant[;] [t]hus, the [a]gents acted in good faith in executing the [s]earch [w]arrant"); *Jefferson*, 2010 WL

1186279 at *6 ("although the evidence . . . shows that the basement is a common area and not technically or exclusively part of the [business named in the warrant], it was objectively reasonable for [the agent] to believe, at the time of the search, that the basement area . . . was part of [the business][;] . . . [t]herefore, I find in the alternative that the officers acted in good faith, that the search of the [basement closet] was reasonable under these specific circumstances"); *United States v. Rodriguez*, 2007 WL 466752 at *58 ("[i]n this case, the warrant permitted the officers to search for items of clothing that contained blood, hair, or fibers[;] [s]ince the warrant makes specific reference to the blood, hair, and fibers on these items, it would be objectively reasonable for the officers to believe that the warrant authorized the seizure of blood, hair, and fibers when those items are found on the upholstery or floor of the vehicle[;] . . . [i]f the officers exceeded the scope of the warrant, they acted in good faith [and] the exclusionary rule does not apply) (citing *Maryland v. Garrison*, 480 U.S. at 88-89; *United States v. Biles*, 100 F. App'x at 494)).

        In sum, under the circumstances of this case, I find that Morabito reasonably and in good faith construed the language of the warrant to authorize the search of Swinton's cellular phone for text messages. Applying the exclusionary rule here would not serve the purpose of deterring law enforcement misconduct, *see Herring v. United States*, 555 U.S. 135, 147-48 (2009); *Hudson v. Michigan*, 547 U.S. 586, 591 (2006), and I thus recommend that Swinton's motion to suppress evidence seized from his phone be denied under *Leon*.

## **CONCLUSION**

For the reasons stated above, I recommend that the district court deny Swinton's motion to suppress evidence seized from his cellular telephone. (Docket # 59).

*s/Marian W. Payson*
MARIAN W. PAYSON
United States Magistrate Judge

Dated: Rochester, New York
      October 21, 2016

...

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

**ORDERED**, that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of this Court within fourteen (14) days after receipt of a copy of this Report and Recommendation in accordance with the above statute and Rule 59(b) of the Local Rules of Criminal Procedure for the Western District of New York.[2]

The district court will ordinarily refuse to consider on *de novo* review arguments, case law and/or evidentiary material which could have been, but was not, presented to the magistrate judge in the first instance.  *See*, *e.g.*, *Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co.*, 840 F.2d 985 (1st Cir. 1988).

**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.**  *Thomas v. Arn*, 474 U.S. 140 (1985); *Small v. Sec'y of Health & Human Servs.*, 892 F.2d 15 (2d Cir. 1989); *Wesolek v. Canadair Ltd.,* 838 F.2d 55 (2d Cir. 1988).

The parties are reminded that, pursuant to Rule 59(b) of the Local Rules of Criminal Procedure for the Western District of New York, "[w]ritten objections . . . shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority."  **Failure to comply with the provisions of Rule 59(b) may result in the District Court's refusal to consider the objection.**

Let the Clerk send a copy of this Order and a copy of the Report and Recommendation to the attorneys for the parties.

**IT IS SO ORDERED.**

*s/Marian W. Payson*
MARIAN W. PAYSON
United States Magistrate Judge

Dated: Rochester, New York
October 21, 2016

---

[2] Counsel is advised that a new period of excludable time pursuant to 18 U.S.C. § 3161(h)(1)(D) commences with the filing of this Report and Recommendation.  Such period of excludable delay lasts only until objections to this Report and Recommendation are filed or until the fourteen days allowed for filing objections has elapsed.  *United States v. Andress*, 943 F.2d 622 (6th Cir. 1991); *United States v. Long*, 900 F.2d 1270 (8th Cir. 1990).